*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JOEL EDWARD LAYMAN,

Defendant-Appellant.

UNPUBLISHED
September 30, 2024
4:04 PM

No. 365280
Livingston Circuit Court
LC No. 2022-027221-FH

Before: RICK, P.J., and MURRAY and MALDONADO, JJ.

MALDONADO, J. (*dissenting*).

In this case, the trial judge demonstrated bias by eliciting testimony favorable to the prosecution, inviting commentary from a police witness regarding defendant's guilt, and interjecting with her opinion of defendant's testimony. Because the majority overlooks recent caselaw explaining how to approach claims of judicial bias and uses defendant's chaotic behavior to justify the judge's mistakes, I respectfully dissent.

## I. BACKGROUND

Defendant stayed at a hotel in Hartland for approximately two months before Brandon Samona, the hotel's owner[1] and manager, decided to kick him out. Defendant, purportedly under the impression that he had become a tenant at the hotel, refused to leave. Samona contacted the police, and the police instructed defendant to leave while also offering to help him load his personal belongings into the car. Defendant continued to refuse to leave the hotel, and the police told defendant that he was under arrest. Defendant apparently resisted arrest and was ultimately wrestled down onto the pavement.

Defendant, who was charged with two counts of assaulting, resisting, or obstructing a police officer (resisting or obstructing), MCL 750.81d(1), and one count of trespass, MCL 750.552, ultimately decided to represent himself at his trial. During a pretrial proceeding, the court

---

[1] There was conflicting evidence regarding the ownership status of the hotel.

-1-

ruled that defendant was a guest at the hotel—not a tenant—and it barred him from making any references to tenancy or eviction. During the trial, the court grew exhausted with defendant's repeated references to the "hotel law of 1913" and his references to topics that were tangential or irrelevant. Defendant particularly struggled with the cross-examination of witnesses, and he was repeatedly reprimanded for arguing with witnesses and "testifying" while asking questions. Ultimately, defendant was convicted as described above, and this appeal followed.

## II. JUDICIAL BIAS

Defendant argues that demonstrations of judicial bias deprived him of his right to a fair trial. I agree.

### A. STANDARD OF REVIEW FOR UNPRESERVED STRUCTURAL ERROR

"The question whether judicial misconduct denied defendant a fair trial is a question of constitutional law that this Court reviews de novo." *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015). Judicial conduct that denies a criminal defendant a fair trial is a structural error that generally requires automatic reversal. *Id.* However, as the majority correctly observes in footnote 1, "unpreserved constitutional errors, including structural errors, are reviewed for plain error affecting substantial rights." *People v King*, 512 Mich 1, 10; 999 NW2d 670 (2023). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Our Supreme Court recently explained that "the existence of a forfeited structural error alone satisfies the third prong of the plain-error standard, and *a defendant need not also show the occurrence of outcome-determinative prejudice*. *People v Davis*, 509 Mich 52, 74; 983 NW2d 325 (2022) (emphasis added).

Under the traditional *Carines* test, satisfying those three requirements is, on its own, insufficient to warrant reversal. Instead, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Carines*, 460 Mich at 763 (quotation marks, citation, and alteration omitted). However, our Supreme Court explained in *Davis* that "a forfeited structural error creates a formal presumption that this prong of the plain-error standard has been satisfied." *Davis*, 509 Mich at 75. "The formal rebuttable presumption in cases of forfeited structural error shifts the burden to the prosecutor to demonstrate that the error did not seriously affect the fairness, integrity, or public reputation of the judicial proceeding." *King*, 512 Mich at 10 (quotation marks, citation, and alterations omitted).

In sum, when asserting a forfeited structural error, a defendant needs to only take two steps: establish that an error occurred and establish that the error was plain. Once the defendant achieves this, the burden shifts to the prosecution to establish that the error was not seriously injurious to the fairness, integrity, and reputation of the proceeding. The error's impact on the outcome of the trial, while relevant to the prosecution's burden, is not a formal prong of the modified plain error rule.

## B. TEST FOR JUDICIAL BIAS

The majority operates with a "strong legal presumption that a trial court acts *without* bias" erroneously derived from civil cases pertaining to judicial disqualification and a criminal case from this Court that predates controlling opinions from the Supreme Court.

In its 2015 opinion in *People v Stevens*, the Supreme Court set out to resolve a "divide" that had formed within this Court regarding "different formulations of the test" for judicial bias. *Stevens*, 498 Mich at 170. The Supreme Court explained that the "new articulation of the appropriate test" requires an inquiry into whether "a trial judge's conduct pierces the veil of judicial impartiality." *Id*. Such an inquiry is resolved by determining if "it is reasonably likely that the judge's conduct improperly influenced the jury by *creating the appearance* of advocacy or partiality against a party." *Id*. at 171 (emphasis added). Importantly, this is not a subjective inquiry into the actual presence or absence of bias. Rather, it is an objective inquiry, from the perspective of the jury, into whether the judge *appeared* biased.

Four years later, the Supreme Court reinforced its articulation of the correct test for judicial bias when it decided *People v Swilley*, 504 Mich 350; 934 NW2d 771 (2019). As the Court explained,

> In *Stevens*, this Court established the appropriate standard for determining when a trial judge's conduct in front of a jury has deprived a party of a fair and impartial trial. A trial judge's conduct deprives a party of a fair trial if the conduct pierces the veil of judicial impartiality. A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party. [*Id*. at 370 (quotation marks and citations omitted).]

Contrary to the majority's assertions, the test articulated in *Stevens* and *Swilley* does *not* make any reference to a presumption of impartiality. This "high hurdle" that the majority describes has no basis in the test that the Supreme Court expressly intended to be the definitive test for claims of judicial bias.

Even though the Supreme Court clearly articulated the test for judicial bias twice in the past decade, the majority opinion does not articulate this test. Instead, it relies on a Court of Appeals opinion that predates *Stevens* to suggest that a defendant claiming bias should produce evidence of "a deep-seated favoritism or antagonism that would make fair judgment impossible . . . ." *In re Contempt of Henry*, 282 Mich App 656, 681; 765 NW2d 44 (2009) (quotation marks and citation omitted). The majority's reliance on *Henry* is particularly misplaced in light of the fact that it is a civil case pertaining to judicial disqualification pursuant to MCR 2.003, and it does not apply the law governing a criminal defendant's right to due process. Disqualification pursuant to MCR 2.003 requires "a showing of *actual bias* or prejudice," *Id*. at 680, whereas an appellate claim of judicial bias in a criminal appeal only requires a defendant to show the *appearance* of bias, *Stevens*, 498 Mich at 171. The majority makes the same mistake by citing *In re MKK*, 286 Mich App 546, 567; 781 NW2d 132 (2009), another case discussing disqualification pursuant to MCR 2.003, for the proposition that "a trial judge's remarks made

during trial, which are critical of or hostile to counsel, the parties, or their cases, ordinarily do not establish disqualifying bias." The majority also cites *Cain v Mich Dep't of Corrections*, 451 Mich 470; 548 NW2d 210 (1996), which is another civil case discussing MCR 2.003, for the same proposition. The present case is not about whether the judge should be disqualified; it is about whether defendant received a fair trial. The Supreme Court never cited MCR 2.003 when it decided *Stevens* and *Swilley*. The only criminal case cited by the majority[2] that describes a presumption of impartiality predates *Stevens* and *Swilley*.

The majority seems to paint this "presumption of judicial impartiality" as a near-impervious wall, the destruction of which requires a remarkable showing by a criminal defendant. However, in *Stevens* and *Swilley*, the Supreme Court made it clear that juries are highly susceptible to showings of judicial bias and that judges must therefore exercise great caution. The Supreme Court explained in *Stevens* that "[b]ecause jurors look to the judge for guidance and instruction, they are very prone to follow the *slightest indication of bias* or prejudice upon the part of the trial judge." *Stevens*, 498 Mich at 174 (quotation marks and citation omitted). In *Swilley*, the Supreme Court again noted "the jury's inclination to follow the *slightest indication of bias* on the part of the judge . . . ." *Swilley*, 504 Mich at 381. While the majority describes its "presumption of judicial impartiality" as "a high hurdle to overcome," the Supreme Court has repeatedly cautioned us to be wary of even the "slightest indication of bias." *Id.*

The majority acknowledges that *Stevens* and *Swilley* make no reference to a presumption of judicial impartiality, but cites *People v Loew*, ___ Mich ___; ___ NW3d ___ (2024) (Docket No. 164133), for the proposition that this presumption is nevertheless part of the framework. However, *Loew* is not on point. In short, *Loew* was about whether the judge demonstrated *actual bias* by way of conduct that took place *outside the presence of the jury* whereas this case is about whether the judge demonstrated the *appearance* of bias by way of conduct that took place *in front of the jury*. In *Loew*, the trial judge exchanged emails with the prosecutor that pertained to defendant's trial, and defendant contended that this violated his right to due process.[3] *Id.* at ___; slip op at 1-2. The Supreme Court engaged in an in-depth analysis of whether the judge's conduct was "of such a character, substance, or extent as to suggest that the trial judge was actually biased or that the probability she was actually biased was too high to be constitutionally tolerable." *Id.* at ___; slip op at 19-24. Given that a claim of actual bias, that does not turn on the jury's perception, is analogous to disqualification pursuant to MCR 2.003, it makes sense that the Supreme Court relied on cases applying this rule.

Several aspects of the *Loew* opinion make clear that the Supreme Court intended that it be applied in scenarios distinct from when *Stevens* and *Swilley* should be applied. First, the Supreme Court did not apply the *Stevens* factors described both in the majority opinion and in section II.C of this opinion. Second, the Supreme Court did not cite *Swilley* at all. Third, the Supreme Court's two citations to *Stevens* were to distinguish it from *Loew*. When explaining why "the trial judge's failure to recuse herself in violation of MCR 2.003(C)(1)(b) did not result in a miscarriage of

---

[2] *People v Jackson*, 292 Mich App 593, 597-598; 808 NW2d 541 (2011).

[3] The defendant also argued that disqualification was warranted pursuant to MCR 2.003, but that is not the section cited by the majority.

justice," it emphasized that "the jury was unaware of the trial judge's ex parte communications." *Id*. at ___; slip op at 16. It then noted the emphasis that *Stevens* placed on the impact that the court's actions had on the jury. *Id*. The only other citation to *Stevens* was in a footnote in which the Supreme Court stated that "the failure to recuse after a judge's conduct or actions have created an appearance of impropriety" does *not* "rise to the same level as when a judge improperly injects themselves into a criminal trial such that the veil of impartiality is destroyed, creating a structural constitutional error." *Id*. at ___ n 7; slip op at 17. Therefore, as the Supreme Court openly acknowledged, *Loew* is not on point.

In sum, the majority's characterization of defendant's "high hurdle" has no basis in the caselaw governing this issue, and the majority opinion does not lay out the correct framework.

## C. FACTORS TO CONSIDER

An inquiry into whether the veil of judicial impartiality requires a reviewing court to examine the totality of the circumstances. *Stevens*, 498 Mich at 172.

> In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors, including the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions. [*Id*.]

This list of factors is not exhaustive, and a reviewing court should determine the relevance and weight of any given factor in the context of the case before it. *Id*. As discussed, "[b]ecause jurors look to the judge for guidance and instruction, they are very prone to follow *the slightest indication* of bias or prejudice upon the part of the trial judge." *Id*. at 174 (quotation marks and citation omitted; emphasis added). Therefore, demonstrations of judicial bias need be less severe than other forms of error in order to warrant reversal. See generally *id*.

## D. NATURE OF CONDUCT

"As an initial matter, a reviewing court should consider the nature or type of judicial conduct itself" which "may come in myriad forms, including belittling of counsel, inappropriate questioning of witnesses, providing improper strategic advice to a particular side, biased commentary in front of the jury, or a variety of other inappropriate actions." *Id*. at 172-173. In this case, my concerns pertain to the court's commentary on Samona's right to have defendant removed from the hotel and the court's questioning of Sergeant Chad Sell. I disagree with the majority's statement that the appeal is about the court's "overall handling of defendant." While these issues should be viewed in the greater context of the court's ongoing frustration with defendant's conduct as a pro se litigant, defendant has isolated specific instances of bias which were unrelated to defendant's conduct and were not connected to the judge's duty to control the proceeding.

## 1. THE COURT EXPRESSED ITS OPINION ON TRESPASS COUNT

"One form of judicial bias is biased commentary in front of the jury." *People v Willis*, 322 Mich App 579, 590; 914 NW2d 384 (2018). "It is essential that the judge not permit his [or her] own views on disputed issues of fact to become apparent to the jury." *Stevens*, 498 Mich at 174 (quotation marks and citation omitted). This is because "jurors in a criminal case may be impressed by any conclusion reached by the judge as to the guilt of the accused." *Id.*, quoting *People v Bigge*, 297 Mich 58, 70; 297 NW 70 (1941).

As noted above, there was conflicting testimony regarding whether Brandon Samona owned the hotel or was only a manager. This issue led to the following exchange that occurred while the prosecution was cross–examining defendant:

*Q.* [W]hen Sergeant Sell was there, he also asked you to leave. Is that correct?

*A.* Yes.

*Q.* And you also refused to leave when he told you to?

*A.* Yes.

*Q.* And did he indicate to you that he was acting on behalf of Mr. Samona?

*A.* Yes.

*Q.* And you still refused to leave?

*A.* Yes.

*Q.* And he told you that Mr. Samona was the manager?

*A.* Uh—

*Q.* Did he tell you that—

*A.* —I don't know—

*Q.* —Mr. Samona was the manager?

*A.* —if he told me that.

*Q.* I'm sorry?

*A.* I don't recall him saying anything about what Brandon Samona was.

*Q.* Did he tell you that Brandon Samona was the owner?

*A*. No, he didn't say.

*Q*. Do you recall getting into an argument, making the comment, oh Brandon's not the owner; I know better? Do you recall making that comment?

*A*. Well that's because Brandon told me that, that day that he wasn't the owner. So I, I just repeated what Brandon had—I thought Brandon was the owner the whole time I was there until that Friday when he started the whole dispute about, you know, I'm not the owner, you know, and—

*The Court*. Okay, I think we're getting to a cloudy—

*Defendant*. Okay.

*The Court*. —issue here. I'm going to give the jury some idea what I, what I think. It doesn't matter if you're the owner of a piece of property, if you are acting as an agent or a manager or even the hotel clerks. He said to tell you to leave. It's like someone coming onto your personal property and you saying leave and the person doesn't leave, then you can call the police and the police often times will go back to the person who said leave and say, did you say to leave. That's to confirm that this would be a trespass if he stayed. *So it doesn't matter if [Samona] is the owner or manager. That's kind of a red herring. That's not—he can say that. He can say I want you to leave on behalf of the owner,* although he did say he was the owner, he doesn't like to say that he's the owner, I guess.

*[Prosecutor]*. Thank you, Judge [Emphasis added.]

Given the prohibition against judges telling the jury their opinions on a case, *see Stevens*, 498 Mich at 174, the court should have known not to make a statement that began with, "I'm going to give the jury some idea what I, what I think." Nevertheless, the court—without invitation from either party—intervened to express its opinion regarding a contested issue and to describe defendant's position as "kind of a red herring." Indeed, given the evidence offered up to that point, the court essentially told the jury that it believed defendant was guilty of trespass. I am not blind to the fact that the evidence against defendant regarding the trespass count was strong;[4] however, defendant has an absolute right to have the strength of that evidence assessed by a jury of his peers. Without context, this statement reads as though it is from the prosecution's closing arguments.

More specifically, as pertinent to this case, MCL 750.552 provides, "[A] person shall not . . . [r]emain without lawful authority on the land or premises of another after being notified to depart by the owner or occupant or the agent of the owner or occupant." Thus, an angle that defendant could have taken to defend against the trespass charge might be to cast doubt on whether Samona was an agent of the owner such that he had authority to forcibly remove a long-term guest from the hotel without any notice; it is not difficult to imagine owner-manager relationships in

---

[4] It is worth reiterating that this issue is *not* subject to harmless error review. See *Stevens*, 498 Mich at 164.

which the owner has not delegated the authority to unilaterally remove a long-term guest. At minimum, the fact that Samona had apparently told defendant he was not the owner, coupled with the fact that defendant was purportedly attempting to contact Best Western when the police arrived, could have opened the door for defendant to argue he reasonably believed that he had the right to stay. The trial court pulled this option out of play by essentially instructing the jury that the prosecution proved this element. This interjection was particularly unwarranted in light of the fact that defendant was not being combative or disruptive at that time. Rather, he was providing clear and responsive answers to the prosecution's questions, and the prosecution should have been left to continue its cross-examination as it saw fit. Indeed, it was the prosecution that was taking defendant down this road, and it arguably appeared as though the court was steering the prosecution toward what it viewed as a more effective strategy.

The majority characterizes this interjection as enforcement of the trial court's order that defendant could not "argue to the jury that he was a tenant of the hotel." There were points in the trial where defendant tried to skirt this order by replacing landlord-tenant law with nonexistent laws pertaining to the rights of guests at hotels. However, at the time of this interjection, defendant was in no way asserting that he was a tenant or that he was exercising his "guest rights." Rather, he was directly responding to the prosecution's questions regarding whether Samona owned the hotel. Therefore, I disagree with the assertion that the court was merely enforcing its pretrial order.

In sum, this statement would have been an effective closing argument for the prosecutor, but it was inappropriate for the judge.

## 2. THE COURT ELICITED TESTIMONY FAVORABLE TO THE PROSECUTION

The trial court overstepped and demonstrated bias by asking questions of Sergeant Sell that exceeded the proper purpose of clarification, that were likely to elicit testimony favorable for the prosecution, and that invited impermissible commentary on defendant's guilt.

> [W]hen evaluating a judge's questioning of witnesses, a reviewing court must first bear in mind that such interrogation is generally appropriate under MRE 614(b). . . . [T]he central object of judicial questioning should be to clarify. Therefore, it is appropriate for a judge to question witnesses to produce fuller and more exact testimony or elicit additional relevant information. [*Stevens*, 498 Mich at 173 (citations omitted).

"In other words, it is appropriate for a judge to ask questions of a witness that are designed to make clearer otherwise unclear, vague, or confusing testimony." *People v Swilley*, 504 Mich 350, 373; 934 NW2d 771 (2019). However, "it is not the role of the court to impeach a witness or undermine a witness's general credibility. A judge's responsibilities do not include emphasizing or exposing potential weaknesses in a witness's testimony or conveying the judge's personal view on whether a witness should be believed." *Id*. (citation omitted). Moreover, "[i]t is inappropriate for a judge to exhibit disbelief of a witness, intentionally or unintentionally." *Stevens*, 498 Mich at 174.

### a. Risks Posed by Handcuffs

The following exchange occurred after defendant finished cross-examining Sergeant Sell:

*The Court.* Okay. I have a question, if the jury doesn't. Putting handcuffs on someone, you usually handcuff people behind their backs?

*The Witness.* Yes.

*The Court.* Okay. Is that—can that be considered kind of a da—, a dangerous situation with handcuffs, like if you get one handcuff on but one handcuff is out or one hand is out, what happens?

*The Witness.* So that very easily could, turns [sic] into a homemade nunchuck which in police academy and real life I've seen enough damage where one handcuff goes on and the person starts swinging it, they're swinging a, a metal loop that's this wide around, and they could do a lot of damage.

Contrary to the majority's characterization, this unprompted intervention was not an "attempt[] to control and direct" the trial. These questions did not follow from anything elicited by the parties and were not asked to clarify any other statements made by Sergeant Sell. Indeed, the possibility of only one hand being cuffed was brought up solely by the judge, further creating the appearance of advocacy for the prosecution. Moreover, the questions clearly nudged Sergeant Sell toward testimony that would help the prosecution by suggesting that defendant's conduct was creating a situation that could quickly turn dangerous. "Although this might be an effective line of inquiry for the prosecution, it was an entirely inappropriate one for the judge." *Swilley*, 504 Mich at 377. Finally, the second question—which was leading in nature—suggested that the judge personally believed defendant had engaged in dangerous conduct. Moreover, these questions were completely unrelated to controlling defendant's questions, comments, and decorum.

The majority believes that this questioning was appropriate "because prior to the prosecution's recalling of Sergeant Sell, Deputy Joel Ash, a responding deputy, testified about the danger of individuals resisting arrest." Deputy Ash testified that "once you make the decisions to put handcuffs on somebody, if they resist in any way, the situation can deteriorate quickly." The majority's contention that the court asked Sergeant Sell these questions so that it could clarify this testimony from Deputy Ash stretches the record to fit the outcome. If the court was confused by Deputy Ash's testimony that "the situation can deteriorate" while a person is being handcuffed then it could very easily have asked Deputy Ash to explain what he meant. The idea that the court would instead wait until Sergeant Sell was recalled and then finished testifying to seek clarification of Deputy Ash's testimony simply does not make sense. Moreover, the court did not say anything to suggest that it was following up on Deputy Ash's testimony. Finally, Deputy Ash did not comment on a scenario in which only one handcuff was on, that was a scenario that the judge came up with unprompted.

The majority also defends these questions by describing them as pertaining to "an irrelevant point." It is unclear to me how the suggestion that the court risked confusing the jury by eliciting irrelevant testimony makes this better. In my opinion, this makes it worse. These questions risked confusing the jury regarding whether defendant resisted while one hand was cuffed and created the appearance that defendant's conduct was worse than could be supported by the evidence. Finally, the majority's comment that "the irrelevancy of the question" meant that there was no

"real impact on the jury" confuses the issue. To reiterate, defendant does not need to establish outcome-determinative prejudice; rather, defendant needs to establish that the question could have created the appearance that the court was acting as an advocate for the prosecution. *Davis*, 509 Mich at 74; *Stevens*, 498 Mich at 171.

**b. Comments on Defendant's Guilt**

The court's next questions harkened back to testimony that Sergeant Sell gave during direct examination. Sergeant Sell offered the following testimony in response to a question posed by the prosecutor:

> So I wouldn't consider the resist and obstruct me pulling him out of the room. . . . When I pulled him out of the room, that wasn't resisting and obstructing to me. That was him noncompliant. . . . The resist and obstruct is when he tries to pull forward when we've already told him, you have three police officers standing there with hands on you, you, you know; you understand what's happening; you know you're going to jail; why are you pulling away[?]

This led the court to ask the following questions after the parties were finished questioning Sergeant Sell:

> *The Court*. Okay. I have another question. You said something about his hands and the scratches on his hands and you said something about, what's [sic] why we do R and O. Is that what you meant to say or did I mishear you?
>
> *The Witness*. So when I—so me pulling him out of the room, in my mind that does not constitute resisting and obstructing.
>
> *The Court*. That's not what you were—
>
> *The Witness*. The—yep.
>
> *The Court*. Okay.
>
> *The Witness*. The, the fact that we had to physically restrain him and take him to the ground—
>
> *The Court*. uh-huh.
>
> *The Witness*. —in my mind constitutes a legitimate use of force—
>
> *The Court*. Uh-huh
>
> *The Witness*. —to where we are physically controlling almost every part of that person's body to place them in handcuffs. He was not charged with resisting and obstructing because he was injured . . . .
>
> *The Court*. Uh-huh.

*The Witness*. That was the fact that we took him down on a very porous cement pavement right outside of the hotel room.

*The Court*. Is that where you're saying that he resisted and obstructed the arrest?

*The Witness*. Once—

*The Court*. Outside the hotel room when you tried to put on handcuffs?

*The Witness*. Right. . . .

While this time the court was asking for clarity regarding prior testimony, the questions nonetheless were inappropriate because the court was actively inviting a witness to offer an opinion regarding defendant's guilt. See *People v Fomby*, 300 Mich App 46, 53; 831 NW2d 887 (2013) ("[A] witness cannot express an opinion on the defendant's guilt or innocence of the charged offense . . . ." (quotation marks and citation omitted)). Once again, these questions cannot be attributed to any misbehavior on the part of defendant.

Indeed, the court demonstrated awareness of the fact that this line of questioning was inappropriate when it intervened to prevent defendant from asking the same question to Deputy Ash:

*Q*. Sergeant Ash, or Deputy Ash, what constitutes resisting in your mind?

*The Court*. Mr. Layman, that's something for the court to give to the jury. It's not for a witness to tell the jury what the law is. It's for me.

In other words, the court instructed defendant not to ask Deputy Ash what he considers to be resisting arrest shortly before asking the same question to Sergeant Sell.

3. NECESSARY REPRIMANDS OF DEFENDANT LEFT JURY SUSCEPTIBLE TO BELIEF THAT DEFENDANT AND THE COURT WERE ADVERSARIES

There is an old saying in legal circles that "a man who is his own lawyer has a fool for a client." This sentiment is certainly understandable in the context of criminal proceedings in which an indigent defendant refuses the assistance of a public attorney offered at the state's expense. The perceived wisdom of doing so notwithstanding, criminal defendants have a constitutional right to act *in propria persona*. See *Faretta v California*, 422 US 806, 807; 95 S Ct 2525; 45 L Ed2d 562 (1975); *People v Anderson*, 398 Mich 361, 366; 247 NW2d 857 (1976). Those of us who have had the privilege of serving as trial-level judges understand that proceedings involving self-represented parties can quickly become chaotic, and while judges ought to be mindful of a self-represented litigant's ignorance, such litigants are not entitled to break the rules.

In this case, defendant and the judge quarreled throughout the day, and this was largely a result of defendant's conduct. In particular, defendant regularly veered into commentary regarding "hotel law" and "guests rights"; he argued with witnesses he attempted to cross–examine and made lengthy statements instead of asking questions; and he baselessly asserted that the dashcam video

was actually a "reenactment" instead of an authentic video. When confronted with difficult litigants such as defendant, arguments and reprimands—including those in the presence of the jury—are unavoidable. Moreover, the fact that the court's frustration grew as the day dragged on is wholly understandable. However, an antagonistic dynamic between the judge and defendant, especially when compared against a cordial relationship with the legally-trained prosecutor, can incidentally make it appear as though the judge and prosecutor are on the same team. Justified hostility toward a defendant's in-court conduct and procedural ignorance will compound the damage done when a judge interjects with questions helpful to the prosecution and commentary directly adverse to the defendant's theory. Put differently, regular disagreements with a defendant regarding conduct and procedure creates a heightened risk that the jury will believe the court also disagrees with the defendant regarding the merits. This is by no means intended to fault judges for controlling courtrooms; rather, this is simply an observation of the likely impact that such a dynamic will have on a jury's perception.

In this case, the court was regularly—and justifiably—interrupting, arguing with, and admonishing defendant. This began in jury selection and continued all the way through closing arguments. These procedural clashes were irrelevant to the merits of the trial. However, the above described incidents in which the court questioned witnesses and commented on the validity of the defense theory were sprinkled in with these clashes regarding defendant's conduct. This could easily have caused the lines between conduct-based and merits-based disagreements to blur and create the appearance that the court and defendant were adversaries. I absolutely do not fault the judge for controlling her courtroom and making defendant follow the rules,[5] but I cannot ignore the fact that this ongoing dynamic heightened the impact of the judge's demonstrations of bias.

## 4. THE COURT'S INTENT WAS IRRELEVANT

I have no doubt that the judge was well-intentioned and never meant to deprive defendant to his right to a fair trial. Comments that our Supreme Court made in 1884 remain relevant:

> In this case we are satisfied the plaintiff has not had a fair trial. In saying this it is not necessary to impute to the judge any purpose to be a partisan in the case, or otherwise unfair. It is not likely he intended to try the case with less than his customary urbanity and courtesy; and when he brings before the jury, as he does in his charge, the familiar figure of the goddess of justice, with her scales nicely weighing and scrutinizing the evidence, it is to be assumed that he meant to be as impartial himself as he directed the jury to be. It is, nevertheless, possible for a judge, however correct his motives, to be unconsciously so disturbed by circumstances that should not affect him, as to do and say, in the excitement of a trial, something, the effect of which he would not at the time realize, and thereby accomplish a mischief which was not designed. Possibly, such circumstances may have existed in this case. [*Wheeler v Wallace*, 53 Mich 355, 358; 19 NW 33 (1884).]

---

[5] "It is well established that the trial court has a duty to control trial proceedings in the courtroom and has wide discretion and power in fulfilling that duty." *Willis*, 322 Mich App at 590.

In this case, the judge was presented with a difficult defendant and a frustrating trial. I have no doubt that the judge did her best, and I absolutely do not question the judge's motives or integrity. Judges are human and mistakes happen. Unfortunately, the judge's good intentions are not relevant to the analysis and do not diminish the impact of her mistakes.

## E. APPLICATION OF REMAINING FACTORS

The above discussion of the nature of the conduct at issue does not end our analysis. The Supreme Court has also instructed us to discuss tone, length/complexity, one-sidedness, and curative instructions.

## 1. TONE AND DEMEANOR

"Because of the jury's inclination to follow the slightest indication of bias on the part of the judge, to ensure an appearance of impartiality, a judge should not only be mindful of the substance of his or her words, but also the manner in which they are said." *Swilley*, 504 Mich at 381 (quotation marks, citation, and alteration omitted). While I could not observe the "trial judge's tone and demeanor first hand, a judge's hostility, bias, or prejudice can sometimes be gleaned from the nature or choice of the words used by the judge or the series or structure of the court's questions." *Id*. Moreover, "in certain circumstances, the very nature of the words used by the judge can exhibit hostility, bias, or incredulity." *Stevens*, 498 Mich at 176.

The above discussion in section II.D.3 is relevant to this factor as well. Throughout the trial, the court and defendant were at odds. It is undisputed that, as the day progressed, the court became increasingly exasperated with defendant. Regarding the comments about the viability of defendant's trespass defense, the court's comments seemed directly borne of frustration with what it perceived to be a frivolous defense and unnecessary testimony. While the questions with Sergeant Sell did not appear to have a frustrated tone, they still occurred during a trial in which hostility between defendant and the judge was the norm.

By the day's end, the court became quick to intervene, even when questions were not necessarily objectionable. For example, the following interruption occurred while defendant was cross-examining Samona:

> *Q*. When Sergeant Sell first approached you and asked you the right question, what did he do wrong, do you remember what you said?
>
> *A*. I do not.
>
> *Q*. Wasn't there a long pause and then you said nuisance, he's been a nuisance?
>
> *The Court*. Mr. Layman, you're making a statement now, aren't you?

Contrary to the court's interjection, leading questions are appropriate during cross-examination. MRE 611(d). The court made the same interjection when defendant asked Samona: "So in other words, you were running my card weekly until the [date I was removed] and then closed me out.

Right?" Again, this question was appropriate for cross-examination. The court also interrupted defendant's testimony[6] at least four times without being prompted by an objection from the prosecution,[7] further creating the general appearance of hostility between the two. These interjections led to lengthy arguments in the jury's presence, including one which concluded with defendant being chastised for speaking under his breath.

In sum, the tone and demeanor of judicial intervention, particularly when interposed with the general tone and demeanor of the trial, weighs in favor of defendant's claim of judicial bias.

## 2. LENGTH OF TRIAL AND COMPLEXITY OF ISSUES

Judicial conduct should be evaluated both in the context of the trial's length and "the complexity of the particular issues that were subject to judicial inquiry." *Swilley*, 504 Mich at 387 (emphasis omitted). "In a long trial, or one with several complicated issues posed to the jury, for instance, it may be more appropriate for a judge to intervene a greater number of times than in a shorter or more straightforward trial." *Stevens*, 489 Mich at 176. Further, "a judge's inquiries may be more appropriate when a witness testifies about a topic that is convoluted, technical, scientific, or otherwise difficult for a jury to understand." *Id*.

The length of the trial and complexity of the issues both weigh heavily in favor of defendant's claim of judicial bias. The entire trial started and finished within one day. While the instances of judicial intervention might not have sufficed to establish bias if spread in over several days, they loom large when crammed into such a brief trial. Complexity weighs even more heavily in favor of defendant's argument. This case is remarkably simple; defendant refused to leave a hotel then the police forcibly pulled him from the room and brought him down to the ground. There were no complex, technical, or scientific issues requiring the judge, rather than the prosecutor, to make comments or ask questions.

## 3. ONE-SIDEDNESS

"Judicial partiality may be exhibited when an imbalance occurs with respect to either the frequency of the intervention or the manner of the conduct." *Stevens*, 498 Mich at 177. "This inquiry is therefore twofold: in order to determine whether judicial questioning was imbalanced, a reviewing court must evaluate *both* the frequency of the questions *and* the manner in which they are asked." *Swilley*, 504 Mich at 388. It is undisputed that the interruptions, questions, and comments were all directed toward defendant or in favor of the prosecution. However, the weight of this factor is tempered considerably by the fact that intervention was necessary to effect defendant's compliance with prior rulings and court decorum. Nevertheless, there were no incidents analogous to those isolated above—unsolicited comments and questions directly

---

[6] Because he was representing himself, defendant's direct "examination" involved him speaking freely without actually being examined by an attorney.

[7] The prosecution also raised several objections to defendant's testimony, so it was apparent that unilateral intervention was not necessary to keep defendant from veering into irrelevant subject matters.

pertaining to the merits of the trial—that were made in defendant's favor. Therefore, this factor favors defendant's claim of bias.

## 4. CURATIVE INSTRUCTIONS

The final factor is the presence of curative jury instructions. "This factor is not considered in isolation; rather, the totality-of-the-circumstances test requires that this factor be considered alongside the others." *Swilley*, 504 Mich at 390 (quotation marks and citation omitted).

> The model jury instructions—both for civil and criminal trials—emphasize that a judge's comments, rulings, and questions do not constitute evidence and that the jury should not attempt to discern the judge's personal opinion while considering the case. Additionally, during the course of a proceeding, a trial judge has the ability to issue a curative instruction immediately in response to conduct that could give rise to the appearance of bias. Because it is well established that jurors are presumed to follow their instructions, a curative instruction will often ensure a fair trial despite *minor or brief inappropriate conduct*. Depending on the circumstances, an immediate curative instruction may further alleviate any appearance of advocacy or partiality by the judge. That said, in some instances judicial conduct may so overstep its bounds that no instruction can erase the appearance of partiality. [*Stevens*, 498 Mich at 177-178 (quotation marks, citations, and alteration omitted; emphasis added.]

On balance, the Supreme Court's opinions in *Swilley* and *Stevens* make clear that jury instructions, particularly the model instructions, are significantly less effective at curing this particular form of error as compared to other forms of error. *Stevens*, 498 Mich at 190; *Swilley*, 504 Mich at 390-391. However, the majority opinion overlooks the Supreme Court's extensive commentary regarding the diminished effect of jury instructions in the context of judicial bias.

In this case, the conduct was neither minor nor brief; this case involved three incidents in a single-day trial in which the court acted as an advocate for the prosecution with respect to issues directly pertaining to defendant's guilt or innocence. "In essence, the judge's words repeatedly conflicted with [her] actions. Therefore, the judge's instructions did not cure [her] impermissible conduct." *Swilley*, 504 Mich at 392. Moreover, a boilerplate instruction stating that the court did not have an opinion is of little import in light of the fact that the court opened its impermissible commentary by explicitly stating that it was going to give the jury its opinion. "This gave little meaning to the judge's preliminary and final instructions that [s]he did not intend to express an opinion." *Id.* at 391.

More generally, in cases such as this that involve regular sparring between the court and a defiant defendant, it could be wise for the court to promptly remind the jury following arguments and reprimands that such incidents are irrelevant to the defendant's guilt or innocence and should not be considered. For example, in *People v Boshell* "the trial court repeatedly reminded the jury that its questions were not meant to reflect any personal opinion and that it was for the jury to decide the facts." *Boshell*, 337 Mich App at 353. Further, it could help to emphasize to the jury that any perceived frustration by the court regarding the defendant's conduct is irrelevant to the jury's fact-finding task. These sorts of instructions would have tempered the risk discussed in

section II.C.3 that frustration over defendant's conduct might be interpreted as frustration with the merits of his defense. In this case, the court offered no such instructions, relying instead on the standard instructions given at the start and end of trial.

In sum, the presence or absence of a curative instruction weighs in favor of defendant's claim of judicial bias.

## F. PLAIN ERROR

As discussed at length in section II.A, this issue is unpreserved and therefore reviewed for plain error. Having established the first requirement—an error occurred—I now assess whether the error was plain. See *Carines*, 460 Mich at 763. "A 'clear or obvious' error under the second prong is one that is not subject to reasonable dispute." *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (quotation marks and citation omitted). One cannot reasonably dispute that it is impermissible for the court to demonstrate bias in favor of a party. Moreover, it is clear and obvious that the court cannot state its opinion that a defense lacks merit, overtly elicit testimony favorable for the prosecution, or elicit commentary on the defendant's guilt. Therefore, I conclude that the second prong is satisfied.

Because this is a structural error, defendant does not need to show that it affected the outcome of the proceeding, and the third prong is automatically satisfied. *Davis*, 509 Mich at 74. Finally, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Carines*, 460 Mich at 763 (quotation marks, citation, and alteration omitted). However, a structural error "shifts the burden to the prosecutor to demonstrate that the error did not seriously affect the fairness, integrity, or public reputation of the judicial proceeding." *King*, 512 Mich at 10 (quotation marks, citation, and alterations omitted). The prosecution does not acknowledge the existence of this presumption, let alone attempt to rebut it. Instead, the prosecution erroneously states that "[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." Accordingly, it has not even attempted to meet its burden to "present specific facts" establishing that this structural error did not deprive defendant of a fair trial. *Id*.

In sum, defendant has established plain error affecting substantial rights arising from the court's demonstrations of bias in favor of the prosecution.

## III. CONCLUSION

I disagree with the framework from which the majority approaches the issue of judicial bias, and I am troubled by multiple instances in which the trial judge demonstrated bias in favor of the prosecution. I believe that defendant's convictions should be vacated and that this case should be remanded for a new trial. Therefore, I dissent.

/s/ Allie Greenleaf Maldonado